# United States District Court
# District of Massachusetts

IRON MOUNTAIN INFORMATION
    MANAGEMENT, INC.,
        Plaintiff,


        v.                     CIVIL ACTION NO. 2010-10328-NMG


VIEWPOINTE ARCHIVE
    SERVICES, LLC,
ALLAN CONGRAVE,
        Defendants.

## MEMORANDUM AND ORDER
## ON PLAINTIFF'S MOTION FOR
## <u>PRELIMINARY INJUNCTION (#3)</u>

COLLINGS, U.S.M.J.

### I.  Introduction

On February 24, 2010, plaintiff Iron Mountain Information Management, Inc. ("Iron Mountain") filed a two count complaint (#1) naming as parties defendant Viewpointe Archive Services, LLC ("Viewpointe") and Allan Congrave ("Congrave" or "the defendant").  In Count I Iron Mountain alleges

a breach of contract claim against Congrave; in Count II a tortious interference with contractual and business relations is alleged against Viewpointe.  When initiating this action, the plaintiff simultaneously filed a motion for preliminary injunction (#3) together with a memorandum of law in support (#4) and four affidavits (##5-8), each with exhibits attached.

The preliminary injunction motion was originally scheduled for hearing before Judge Gorton, the District Judge to whom this case is assigned. However, when the parties sought additional time to prepare, they stipulated and requested, *inter alia*, that "Plaintiff's Motion for Preliminary Injunction [be] assigned to Magistrate Judge Collings for decision and Magistrate Judge Collings' decision on the Motion for Preliminary Injunction shall be treated as an Order of the Court for all purposes." (#17 ¶ 1)  Judge Gorton approved the parties' stipulation (#18) and referred the case to the undersigned for a Final Order on the motion for preliminary injunction. (#19[1])

On March 11, 2010, the defendants filed an opposition to the preliminary injunction (#20) as well as four affidavits (##21-24).  With a motion for leave

---

[1]

At the hearing on March 16, 2010, the parties confirmed their agreement that pursuant to 28 U.S.C. § 636(c), the referral of the preliminary injunction motion to the undersigned was for a final decision with any appeal to be taken to the First Circuit Court of Appeals.

having been allowed, Iron Mountain filed a reply brief. (#26)  Oral argument on Iron Mountain's motion was heard on March 16, 2010.[2]  A conference was held with counsel on March 19, 2010, at which the Court gave certain tentative rulings on a number of issues and directed that an evidentiary hearing be held on what the duties and responsibilities of the job with Viewpointe for which Congrave was hired are and whether those are different from what was represented to Iron Mountain when Congrave was still employed at Iron Mountain. (*See* Electronic Clerk's Notes dated 03/19/10)  The parties agreed that the evidentiary hearing should be held on March 25, 2010.

At the March 25th evidentiary hearing, a number a witnesses were called to testify and counsel thereafter presented further argument.[3]  The record on the preliminary injunction motion is now closed, and the matter stands ready for decision.

## II.  The Background Facts

Congrave was hired by Iron Mountain as a Regional Sales Manager in late 2002. (#5 ¶ 3; #21 ¶ 2)  When he was hired, the defendant had no prior

---

[2]

An Affidavit of Allan Congrave (#30) was filed in open court at the hearing.

[3]

The transcript of the evidentiary hearing (#33) has been filed and shall be referenced by the designation "TR."

information management (including physical records management) experience, but Congrave brought with him strong general sales and marketing skills acquired through his previous employment with First Data Corporation ("First Data"). (#5 ¶ 3; #21 ¶ 2)  As a Regional Sales Manager, Congrave managed a sales team selling Iron Mountain services to customers in Texas. (#5 ¶ 3)  In early 2004 Congrave was promoted to the position of Enterprise Account Executive and then in October that same year he was promoted to Vice President of Sales for the Southeast area. (#5 ¶¶ 4, 5; #21 ¶¶ 3, 4)

As Vice President of Sales Congrave supervised approximately sixty sales employees who, directly and indirectly, were responsible for selling Iron Mountain's services in a territory covering about one-quarter of the United States. (#5 ¶ 5; #21 ¶ 4; TR at 9)  Congrave's sales team produced one-fifth of Iron Mountain's new sales revenues. (#5 ¶ 5)  With this promotion, Congrave relocated to Georgia and was required to sign an Employee Confidentiality and Non-Competition Agreement (the "Agreement") with Iron Mountain. (#21 ¶¶ 4, 5; #4-2) Due to his Georgia residency, an Addendum (the "Addendum") was added to Congrave's Agreement which altered and/or replaced certain terms of the original Agreement. (#21 ¶ 6; #4-2)  Each year thereafter as Congrave's compensation changed he reaffirmed the Agreement and Addendum. (#21 ¶

4

8)

The applicable version of the Agreement and Addendum is dated January 6, 2009. (#21 ¶ 9; #4-2)  The Agreement contains a Choice of Law/Jury Waiver provision which provides, in full, as follows:

> 12.  Choice of Law/Jury Waiver: This Agreement shall be deemed to have been made in the Commonwealth of Massachusetts, shall take effect as an instrument under seal within Massachusetts, and the validity, interpretation and performance of this Agreement shall be governed by, and construed in accordance with, the internal law of Massachusetts, without giving effect to conflict of law principles.  Any action, demand, claim or counterclaim relating to the terms and provisions of this Agreement, or its breach, may be commenced in Massachusetts in a court of competent jurisdiction and shall be resolved by a judge alone; both parties hereby waive and forever renounce the right to a trial before a civil jury.

Agreement #4-2.

Subsection 2.C. of the Addendum, applicable in Georgia, provides that "[t]he last sentence of Section 12 of the Agreement is deleted in its entirety and the following new sentence is inserted in lieu thereof: 'Any action, demand, claim or counterclaim relating to the terms and provisions of this Agreement, or to its breach, may be commenced in Massachusetts in a court of competent jurisdiction.'" (#4-2)  The first sentence of Section 12 of the Agreement is left

untouched by the Addendum.

While the Agreement and Addendum were essentially drafted by Iron Mountain, the definition of two terms in the non-competition clause in the Addendum were left blank and ultimately completed by Congrave.[4] (#21 ¶ 10; #4-2)  First, paragraph 2(I) provides:

> (I) "Business" of Iron Mountain means the provision of the following goods or services:
>
> _____
> [LIST  PRODUCT,  SERVICE,  AND/OR DIVISION/BUSINESS  FOR  WHICH  EMPLOYEE  IS ENGAGED]

Addendum #4-2.

Congrave wrote "RECORDS MANAGEMENT" in the blank.  (#21 ¶ 11; #4-2) He asserts that by "RECORDS MANAGEMENT" he "meant the physical records management work done by the North American Physical Business at Iron Mountain..., where [he] worked.  [He] did not intend for the term to include electronic information management as conducted by Iron Mountain's WorldWide Digital team." (#21 ¶ 11)

---

[4]

According to the Addendum applicable in Georgia, Sections 1 through 4 of the Agreement were deleted in their entirety and Sections 1 through 4 of the Addendum were inserted in their stead. (#4-2) Thus, the non-competition clause at issue, Section 2, is found in the Addendum. (#4-2)

Second, paragraph 2(iii) provides:

> (iii) "Territory" means
>
> _____
> [IDENTIFY TERRITORY IN WHICH EMPLOYEE IS
> ENGAGED]

Addendum #4-2.

Congrave inserted "SOUTHEAST" in the blank. (#21 ¶ 12; #4-2) He wrote that

term "because [his] title was 'Vice President of Sales, Southeast.'" (#21 ¶ 12)

According to Congrave, "Iron Mountain organizes its records management

business in two primary functional segments: Physical...and WorldWide Digital."

(#21 ¶ 14) He claims to have "worked in the Physical segment of Iron

Mountain's business" and not in the WorldWide Digital segment. (#21 ¶ 15)

Congrave states that he "did not have any particular expertise in or detailed

knowledge of the WorldWide Digital segment." (#21 ¶ 16) At the same time,

however, Congrave acknowledges that about 8% of his "monthly sales quota

was based on generating sales opportunities for the WorldWide Digital

segment." (#21 ¶ 16)

Michael H. Karp ("Karp"), the Executive Vice President of Sales at Iron

Mountain, has a different perspective:

> Selling electronic records management services

was a significant part of Allan Congrave's role as Vice President for the Southeast region.  Roughly 15% of Allan's 2009 revenues were attributable to recurring DMS (Document Management Solutions including imaging and scanning services to convert paper records into electronic records) revenues or digital archiving/cloud storage revenues.

*****

Allan and his group were exceptionally knowledgeable about and successful in selling electronic services.

*****

Allan knows Iron Mountain's DMS business thoroughly.  He knows our scanning and imaging capabilities and limitations, what technology we use and how it is set up, how we price our imaging and scanning services, what services are most profitable, which marketing and sales strategies have been successful, and situations in which we have struggled and succeeded.  Allan participated in numerous DMS sales calls and received reports on DMS revenues and sales pipeline.  He attended training sessions on our DMS capabilities and  helped train other sales employees on how to sell it.  He learned our tools and methods for selling DMS in detail.

Supplemental Affidavit of Michael H. Karp #27 ¶¶ 5, 6, 7; TR Exh. 7 ¶¶ 5, 6, 7.

Karp also claims that Congrave is quite knowledgeable about Iron Mountain's

Digital Records Center for Medical Images ("DRCMI") (#27 ¶¶ 9, 10, 11; TR

Exh. 7 ¶¶ 9, 10, 11) and Digital Records Center for Images ("DRCI") (#27 ¶ 12;

TR Exh. 7 ¶¶ 9, 10, 11)

Karp states in his affidavit that:

8

> As [Congrave] rose through the Iron Mountain organization, he learned the business inside and out. I worked closely with [Congrave] on a regular basis since at least late 2002.  After five years as Vice President of Sales, [Congrave] knows substantial amounts of non-public, competitively valuable information, including at least the following five different kinds of information.

Affidavit of Michael H. Karp #5 ¶ 5; TR Exh. 6 ¶ 5.

The areas of information identified by Karp are Pricing Models and Policies (#5 ¶ 7; TR Exh. 6 ¶ 7), In-Depth Knowledge of Specific Service Strengths and Weaknesses (#5 ¶ 8; TR Exh. 6 ¶ 8), Sales Employee Rankings and Compensation Information (#5 ¶ 9; TR Exh. 6 ¶ 9), Operational Know How (#5 ¶ 10; TR Exh. 6 ¶ 10) and Customer-Specific Information (#5 ¶ 12; TR Exh. 6 ¶ 12)  In addition, Karp states that "[t]he kind of customer-specific information [Congrave] knows would allow an Iron Mountain competitor to develop the ideal sales strategy and sales proposal for each customer." (#5 ¶ 14; TR Exh. 6 ¶ 14)  Further, Karp avers that Congrave "had substantial contact with many Iron Mountain clients" and had "developed a prominent profile in the information management industry and strong relationships with key individuals at many important Iron Mountain customers." (#5 ¶ 16; TR Exh. 6 ¶ 16)  It is all this type of confidential information and customer relationships that the

Agreement and Addendum are meant to protect. (#5 ¶ 17; TR Exh. 6 ¶ 17)

Congrave attests that he learned of a job opportunity at Viewpointe during the fall of 2009. (#21 ¶ 20)  Viewpointe "was a joint venture between IBM and the five largest financial institutions, that... had built this technology to process check transactions and...they were expanding into other information types beyond checks." (TR at 37)  Congrave states that:

> Though it initially was created to provide check image exchange and archive services for its owners, Viewpointe was in the process of expanding its capabilities from checks to general electronic enterprise content management.  However, Viewpointe has not developed, and it is not developing, any capacity for records management and storage of hard copy records whether in paper, CD_ROM or other tangible format. Thus, Viewpointe's business does not operate in the same space as Iron Mountain's North American Physical Business.

Affidavit of Allan Congrave #21 ¶ 22.

From Congrave's perspective, the position at Viewpointe was "an opportunity to utilize [his] leadership experience in the areas of sales and marketing...[and] with [his] strong sales and marketing skills, as well as [his] general knowledge and skill in physical records management, [he] can gain an appreciation for customers' needs and translate those needs back to Viewpointe's technical staff." (#21 ¶ 24)  He accepted a "Product Director position which was to focus on

10

developing Viewpointe's electronic information management capabilities." (#21 ¶ 25)

On Sunday January 3, 2010, Congrave called James Dodson ("Dodson") at home to tell him that he was leaving Iron Mountain. (TR at 115-116) Dodson is Senior Vice President of Operations for the Southern Area at Iron Mountain (#29 ¶ 1) and "good friends" with Congrave. (TR at 115) During this telephone conversation Congrave told Dodson that Viewpointe "was in the check processing business" and that he had accepted a position as "one of two people in some sort of a business development role." (TR at 117) Over the next several weeks Dodson and Congrave had numerous discussions during which Dodson asked Congrave

> something to the effect of what, you know, why do you want to go into the check processing business, this is a, this is a dying business. And [Congrave] said something to the effect that, you know, they wanted him because of his ability to cross-sell services within their account base, as we do at Iron Mountain.

TR at 18.

Congrave never told Dodson what those services were, but it was Dodson's impression that Congrave "was going to be selling check processing and check archiving services" even though Congrave never specifically said that. (TR at

11

118-119, 126)

When Congrave notified his direct supervisor, Andrew Brown ("Brown"), on January 4, 2010 that he had accepted the job with Viewpointe, he "told Mr. Brown that [he] would be in a business development role as Viewpointe looked to expand its business from check processing to other electronic information types." (#21 ¶ 27; TR at 37-38)  Congrave testified that he "never, ever" told Brown that his role at Viewpointe involved check processing. (TR at 42)  Brown testified that Congrave told him that "[e]lectronic checking solutions was what [Viewpointe], what [Viewpointe's] service was and that that's what he would be doing." (TR at 176-177)  According to Brown, Congrave never told him that Viewpointe was "interested in archiving documents other than checks." (TR at 180)  Congrave told Brown that Viewpointe was not a competitor of Iron Mountain, and Brown "believed him." (TR at 180)

On January 6, 2010, John Roslansky ("Roslansky"), a staff attorney at Iron Mountain, sent a letter to Congrave regarding his contemplated departure from Iron Mountain:

> I understand you are contemplating leaving the Company to pursue a new opportunity with Viewpointe Electronic Content Storage ("Viewpointe").
>
> It is clear to us that Viewpointe is a direct competitor as

12

they are in the electronic imaging and information management space.  As you know, one of the most significant contributions you made here at Iron Mountain was to demonstrate the ability to represent an integrated suite of our services to customers - ranging from the traditional hard copy records management services to our electronics information management services which we offer through our Digital organization.  In our judgment you would be moving into a role at Viewpointe where you would be working for a direct competitor and you would be selling services for them which compete directly with Iron Mountain.

It is our understanding that the role you will step into reports directly to the CEO of Viewpointe.  Given the leadership role you have played at Iron Mountain we expect it is  inevitable that you will disclose our trade secrets and proprietary information in the course of your employ with Viewpointe.  Indeed, as we offer a wider suite of information management services that Viewpointe presently does, the expertise you developed here at Iron Mountain will be of enormous value to them - and pose a significant risk to Iron Mountain.

Affidavit of John W. Roslansky #8 ¶¶ 1-2 and Exh. A; TR Exh. 1.

On or about January 7 or 8, 2010, Karp, Brown's direct supervisor, called Congrave after looking at Viewpointe's webpage and told him "that accepting employment with Viewpointe would be a violation of [his] Agreement because Viewpointe offered document archiving services." (#21 ¶ 34; TR at 41; TR at 178-179)   Based on the website Karp believed that Viewpointe was "a

competitor in our space." (TR at 132-133)

According to Congrave, he

> explained to Mr. Karp that Viewpointe was not a direct competitor to Iron Mountain because the two companies did not offer the same solution to potential customers. [Congrave] explained to [Mr. Karp] that Viewpointe archives electronic information as part of the transaction process/work flow, which Iron Mountain does not do. [He] told Mr. Karp, therefore, that Viewpointe was looking to process different types of information than Iron Mountain.

Affidavit of Allan Congrave #21 ¶ 35; TR at 41.

For his part, Karp avers that Congrave "assured" him that "Viewpointe was not a direct competitor" (#5 ¶¶ 2, 19; TR Exh. 6 ¶¶ 2, 19) and Viewpointe "assured Iron Mountain that it was not hiring [Congrave] for a sales position." (#5 ¶ 2; TR Exh. 6 ¶ 2)   Karp testified that Congrave "was actually upset" at the suggestion that he would compete with Iron Mountain. (TR at 136-137)  During this conversation Congrave also told Karp that "[h]e was going to be an individual contributor selling their services." (TR at 137)  Karp remembers the conversation as being about "check imaging," not a "process/workflow conversation." (TR at 139)  Karp admitted that in his January 7th conversation with Congrave, he knew that in discussing what Viewpointe does, Congrave "was talking about more than checks." (TR at 162)   At the end of the

14

conversation, Karp had formed the belief that Viewpointe was "a competitor but not necessarily a threat." (TR at 140-141)

On January 19, 2010, Roslansky sent a letter to Lou Buglioli, the CEO of Viewpointe, regarding Congrave. (#8 ¶ 3 and Exh. B; TR Exh. 2)   Karp authorized the letter to be sent. (TR at 141)  The letter read, in part, as follows:

> We understand that Mr. Congrave has accepted a sales position with Viewpointe Electronic Content Storage ("Viewpointe")....
>
> \*\*\*\*\*
>
> In his position as a Vice President of Sales, Mr. Congrave was privy to a wide range of confidential Iron Mountain information, and has had substantial contact and interaction with many Iron Mountain clients and prospects.   Iron Mountain considers Viewpointe a competitor within the meaning of Mr. Congrave's [Employee Confidentiality and Non-Competition] Agreement.   Accordingly, Iron Mountain believes that Mr. Congrave's employment with Viewpointe in a role relating to records management would be a violation of the Agreement.  In addition, if Mr. Congrave were to call on or assist others to call on Iron Mountain clients or prospects with whom he had material contact while employed at Iron Mountain or use confidential or propriety Iron Mountain information, he would further violate the Agreement.
>
> \*\*\*\*\*
>
> If Viewpoint plans to employ Mr. Congrave in a role that it believes is consistent with his obligations under the Agreement, please describe his intended role.

Affidavit of John W. Roslansky #8 ¶ 3 and Exh. B; TR Exh. 2.

With respect to the second sentence in the third paragraph of that letter, Karp stated that Iron Mountain "did see [Viewpointe] as a competitor from the imaging and archiving standpoint, but again not a threat to us." (TR at 141)  At this time the plaintiff was not trying to prevent Congrave from working at Viewpointe. (TR at 142-143)

According to a letter in response from Scott J. Harman ("Harman"), Associate General Counsel for Viewpointe, to Roslansky dated January 22, 2010, "upon reading your [January 19th] letter and the attached agreement, [Viewpointe] believe[s] [Congrave's] role is consistent with any obligations he may have thereunder." (#8 ¶ 4 and Exh. C; TR Exh. 3)  As explained by Harman:

> Mr. Congrave was hired for his general expertise and experience with records management and not for any proprietary or confidential information he may have obtained, if any, during his employment with Iron Mountain....Further, your assumption that Mr. Congrave has been hired for a sales position at Viewpointe is mistaken.  Viewpointe has hired him for the position of Product Manager to interact with existing Viewpointe customers looking to expand their current suite of Viewpointe services.   Thus, your concern that Mr. Congrave may use client relationships possibly gained during his employment at Iron Mountain is unfounded.

Affidavit of John W. Roslansky #8 ¶ 4 and Exh. C; TR Exh. 3.

Karp was concerned after reading this letter first, because "Congrave was hired for his general expertise and experience in records management" and, second, because Viewpointe had "hired him for the position of product manager to interact with existing people and customers looking to expand their current suite of Viewpointe services." (TR at 143)  In Karp's view this was "a very different explanation" of Viewpointe's business and what Congrave would be doing for that company than what Congrave had told Iron Mountain. (TR at 142)

In a January 21, 2010 letter from Congrave to Roslansky, the defendant wrote that "Viewpointe is not a direct competitor to Iron Mountain.  Iron Mountain does not offer the solution Viewpointe provides....In addition, I am not reporting to the CEO and I am not taking a sales position; my role is a Product Director." (#8 ¶ 5 and Exh. D; TR Exh. 4)

Karp called Congrave again on or about January 22, 2010 and advised the defendant that Viewpointe had stated that Congrave had been "hired for [his] records management experience." (#21 ¶ 43; TR at 144)  Although Karp basically threatened to terminate Congrave's employment immediately, the defendant "again explained to Mr. Karp that [he] did not view Iron Mountain and Viewpointe as direct competitors, for the same reasons [he] explained to him" during their conversation earlier in January. (#21 ¶ 44; TR at 144)

17

According to Karp, Congrave repeated that Viewpointe was not a competitive threat because it is "a check imaging company." (TR at 144-145)   Congrave ultimately continued to work for Iron Mountain until the end of January. (#21 ¶ 46)

Karp testified that after reviewing Viewpointe's response letter and Congrave's letter dated January 21, 2010, he still believed Congrave's protestations that Viewpointe was not a competitor and that he would not compete with Iron Mountain. (TR at 168)

Roslansky sent Congrave a letter dated January 28, 2010, again authorized by Karp, wherein he stated that:

> In your conversations with our leadership you represented that you were taking a sales role with Viewpointe, and that indeed you expected to lead their sales organization.  You also explained that you would be reporting to the CEO.  We now understand that your role is in product management rather than sales.
>
> *****
>
> Notwithstanding these points, we are not intending to enforce the non-compete at this point.  Though we consider Viewpointe a competitor, we prefer to think that you are an individual of integrity who will respect your commitment not to solicit our customers or employees, and that you will respect the sanctity of our proprietary information.  Should we learn otherwise we reserve the right to enforce the agreement at a later date.

Affidavit of Allan Congrave #21 ¶ 48 and Exh. C; TR at 146; TR Exh. 5.

Since he began working at Viewpointe, Congrave has "joined in Viewpointe's pre-existing efforts to develop electronic information management solutions for its owners...[and] will continue to assist Viewpointe in developing potential electronic information management solutions for its owners and other existing customers." (#21 ¶ 52)

On or about February 9, 2010, Patrick Cervenka ("Cervenka"), an Enterprise Account Executive at Iron Mountain, received a telephone call and an e-mail from a recruiter. (#6 ¶¶ 1, 3)  Attached to the e-mail was a job description for the position of Product Director-ECM at Viewpointe. (#6 ¶ 3 and Exh. A; TR Exh. 9)  The open position was described in the following manner:

> Our Client, Viewpointe, is one of the largest archiving companies in the world (Check Imaging & Exchange Services) used by the nations leading financial institutions (Banks).  They (sic) are the nations (sic) leading provider of technology solutions in the payments industry.
>
> *****
>
> Due to significant growth plans we are actively engaged in recruiting to fill numerous key positions to help take the company to the next level....[The company has] been around for 8 years, and [is] in the process of building increased core competencies to create even greater value for not only the Banking industry, but peripheral and external industries as well in the ECM (Enterprise Content Management) arena.  The

> Technology that got the company to this point is a
> primary catalyst in launching [it] forward as [it]
> continue[s] the process of developing new technology
> and leveraging the footprint [it] already [has]
> established.
>
> *****
>
> One person will interface with Banking Customers and
> the other will work in non-banking developing
> applications that support each (sic).
>
> *****
>
> Viewpointe is looking for a subject matter expert in
> records, these Product Directors will have all the normal
> client interface associated with this type of role, but as
> this is a new foray for Viewpointe this person will be
> looked at as the subject matter expert to lead the
> business in record retention.  So this person would
> supervise the implementation projects that would allow
> Banks and other industries to start shifting their record
> keeping to Viewpointe.  Anything that kills tress (sic), if
> you will...records would encompass all documents, not
> just financial data, e.g. legal documents, tax records,
> loan applications, images, pictures, etc., etc.

Affidavit of Patrick Cervenka #6 ¶ 3 and Exh. A; TR Exh. 9.

In his affidavit (#22), Robert David ("David"), President of Robert David and Associates, Inc. ("RDA"), a professional recruiting and personnel consulting firm, states that he drafted the job description for a Product Director position at Viewpointe that was sent to Cervenka. (#22 ¶¶ 2, 13)  According to David, "Viewpointe did not review or approve this job description." (#22 ¶ 13)  Kim Bobo ("Bobo"), the recruiter at RDA who actually forwarded the job description

20

for a Product Director at Viewpointe to Cervenka, also asserts that the job description was created at RDA and was not reviewed or approved by Viewpointe. (#23 ¶¶ 2, 8)

In his March 16, 2010 affidavit, Congrave states that he "had no communications whatsoever with Mr. David or Mr. Bobo regarding Patrick Cervenka, whether by telephone, by e-mail or by in-person conversations." (#30 ¶ 3)

The President of Viewpointe, Rich Walsh ("Walsh"), likewise avers that the Product Director job description was drafted by RDA and he had not reviewed or approved it before it was sent to Cervenka. (#24 ¶¶ 2, 4) Walsh states that "[t]he Job Description inaccurately describes Viewpointe's current and anticipated goals." (#24 ¶ 5) Specifically Walsh contends that:

> Viewpointe is focused on electronic information management. It has no capacity, and does not intend to develop a capacity, for physical records management. Therefore, for example, to the extent the Job Description describes Viewpointe's business as '[a]nything that kills tre[e]s,' and to the extent it suggests that Viewpointe is taking over all records management for its customers, including physical records, it is incorrect.

Affidavit of Rich Walsh #24 ¶ 6.

However, having reviewed the materials sent by the recruiter to Cervenka,

21

Karp holds the view that, in fact, Viewpointe is a competitor to Iron Mountain.

He attests that those materials

> state that Viewpointe is in the process of a major
> expansion from a check processing company to a
> general records retention and information management
> company.  It states that Viewpointe intends to increase
> its revenue tenfold to become a billion dollar company
> in the next five years by servicing all the records
> retention needs of their existing bank clients and by
> expanding into other sectors of the economy, including
> health care, legal and tax.
>
> *****
>
> Financial services is Iron Mountain's single largest
> sector.  Indeed, many, if not most of the banks for
> which Viewpointe provides checking imaging and
> processing services...are current, major Iron Mountain
> clients, for which Iron Mountain provides a wide range
> of hard-copy as well as digital services.  Viewpointe's
> plan to begin providing these and other financial
> institutions with general information management
> services, poses a major competitive threat to Iron
> Mountain. In addition, If Viewpointe intends to provide
> record retention and document management services
> for the health, legal and tax industries, Viewpointe will
> be competing head-to-head with Iron Mountain across
> the majority of Iron Mountain's business.

Affidavit of Michael H. Karp #5 ¶¶ 22, 24; TR Exh. 6 ¶¶ 22, 24.

When he was being recruited, Congrave received the same Product

Director-ECM job description from Bobo as had been sent to Cervenka. (TR at

10-11)  After reading the material, Congrave thought the job description was

"very generic" but that Viewpointe was positioned "as a competitor to Iron Mountain based on some of the terminology that was being used." (TR at 11) Ultimately through the interviewing process, Congrave came to believe that Viewpointe's technology put that company "in a different space to what Iron Mountain was in." (TR at 15)   Congrave "made the determination that [Viewpointe wasn't] a competitor because all of Iron Mountain solutions focus on inactive information." (TR at 21[5])  As a product director, Congrave was to be "responsible for positioning the solution in the marketplace, expanding beyond, you know, the check business." (TR at 29)   Put another way, "the product director is somebody that coming up with the positioning of the product on how to present that to the, to the companies [the salesperson's] calling on." (TR at 108)  Another part of the job was "to kind of manage [Viewpointe's] relationship with IBM, be an interface with IBM." (TR at 35)

According to the materials received from the recruiter, "[t]he description of the Viewpointe job opportunity states that 'this is a new foray for Viewpointe,' and that the person hired 'will be looked at as the subject matter expert to lead the business in record retention.'  The document states that Viewpointe intends

---

[5]

Karp testified that the Iron Mountain Digital Center for Record Images includes tier 1 archiving capability, albeit limited, which is active information. (TR at 150)

to expand into storage of 'anything that kills tre[e]s. If you will.'" (#5 ¶ 23; TR Exh. 6 ¶ 23)   Had he known that Congrave "was going to help Viewpointe expand from the check imaging business into the business of records management more generally," Karp says that he would have terminated Congrave's employment at Iron Mountain immediately. (#27 ¶ 17; TR Exh. 7 ¶ 17)   Karp states that "if Viewpointe is allowed to employ Allan Congrave to accelerate the growth of its document retention and information management business, Viewpointe will unfairly benefit from confidential and proprietary knowledge that it has taken Iron Mountain many years to develop." (#5 ¶ 25; TR Exh. 6 ¶ 25)

At the evidentiary hearing, Dodson testified that after reading the Viewpointe Product Director-ECM job description, it "clearly looks like they are not only competing with us but looking to, you know, pursue a lot of our business that we not only currently do, but businesses we're developing as well." (TR at 124, TR Exh. 9)   Brown also testified that the document described work that was competitive to Iron Mountain (TR at 183, TR Exh. 9), as did Karp. (TR at 148-149, TR Exh. 9)   Dodson also testified that the document entitled Viewpointe Hosted Digital Content Archives taken from Viewpointe's website described services that are competitive to those offered by Iron Mountain and,

if Congrave was hired by Viewpointe to help provide those services, that he was competing with Viewpointe. (TR at 125, TR Exh. 11)  Brown and Karp were of the same opinion. (TR at 184, TR Exh. 11; TR at 149-150, TR Exh. 11)

As a final exhibit to his affidavit, Roslansky attached a copy of a September 24, 2009 article from a newspaper, American Banker, entitled *With Checks on the Wane, Viewpointe Is Diversifying.* (#8 ¶ 6 and Exh. E; TR Exh. 8)  It is reported in the article that "Viewpointe LLC is expanding into new markets.  The New York company is the industry's dominant repository for banks' check images, and is trying to take advantage of that expertise to store other types of documents for banks and possibly nonfinancial firms as well." (#8 ¶ 6 and Exh. E; TR Exh. 8)  Viewpointe was said to be "moving beyond checks to offer enterprise content management capabilities." (#8 ¶ 6 and Exh. E; TR Exh. 8)  According to the article,

> 'We are not competing with our owners or customers.  We're offering our customers an opportunity to provide even more value to storing and accessing electronic information to their customers,' [Viewpointe president  Richard Walsh] said.
>
> Viewpointe's bank clients already use its service under their own brand when they deliver check images to customers through online banking sites, and Walsh said financial companies could use a similar model to

offer the new services. 'What we're proposing is simply extending that to other types of documents beyond checks, so we could help power additional solutions.'

Affidavit of John W. Roslansky #8 ¶ 6 and Exh. E; TR Exh. 8.

Attorney Roslansky obtained this newspaper article from Viewpointe's website. (#8 ¶ 6)  Karp testified that if he had seen this article before Congrave left Iron Mountain and had been told that Congrave was hired to help Viewpointe achieve the goals set out in the article, he would have terminated Congrave immediately. (TR at 147-148)

Dodson filed an affidavit relating the substance of conversations he had with Congrave after the defendant left Iron Mountain's employ. (#29)  In one of those conversations, Congrave discussed a meeting he had with SunTrust, an Iron Mountain client for which Iron Mountain had been trying to expand its business. (#29 ¶¶ 2, 5)  According to Dodson, Congrave said "that he was discussing with SunTrust a proposal to move certain SunTrust archival data from outdated IBM hardware maintained by SunTrust into storage with Viewpointe." (#29 ¶ 5)  Iron Mountain characterizes this contact as evidence that "within weeks of joining Viewpointe, Congrave was already involved in obtaining digital archiving business from Viewpointe from a major Iron Mountain customer." (#26 at 13-14)

Ryan P. Sommers ("Sommers"), Assistant Director of Digital Forensics at Stroz Friedberg, an international consulting and technical services firm, has submitted an affidavit. (#28 ¶¶ 1,2)  Stroz Friedberg was hired in this case "to provide forensic analysis and advice related to a laptop assigned to Allan Congrave when he worked at Iron Mountain." (#28 ¶ 1)  *Inter alia* Stroz Friedberg found a "fragment, which appears to have been a facebook post by Congrave, describing his new position at Viewpointe." (#28 ¶ 11)  That fragment reads in part: "Start the new job Feb.1. I&#039;ll be tasked with developing Viewpointe&#039;s (new employer) Cloud Storage offering and in the long-term selling it too.  I am totally in over my head but it should be a fun ride." (#28 ¶ 11)

### III.  *The Applicable Law and Legal Standard*

The First Circuit has explained that:

> Over time, we have crafted a four-part framework for use in determining whether the grant or denial of preliminary injunctive relief is appropriate. Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *See*

> *Weaver v. Henderson,* 984 F.2d 11, 12 & n. 3 (1st
> Cir.1993); *Narragansett Indian Tribe v. Guilbert,* 934
> F.2d 4, 5 (1st Cir.1991).

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1 Cir., 1996); *see also ANSYS, Inc. v. Computational Dynamics North America, Ltd.*, 595 F.3d 75, 78 (1 Cir., 2010); *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1 Cir., 2009); *Coquico, Inc. v. Rodriguez-Miranda,* 562 F.3d 62, 66 (1 Cir., 2009).[6]

In this instance it is the plaintiff, as the party requesting preliminary injunctive relief, who "bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1 Cir., 2006)(*citing Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1 Cir., 2003)). Indeed, the Supreme Court has quoted with approval the observation "'that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.' 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948, pp. 129-130 (2d ed.1995) (emphasis added; footnotes

---

[6]

The First Circuit has explained that:

> We apply the federal preliminary injunction standard in a diversity case, at least where the parties have not suggested that state law supplies meaningfully different criteria. *See Ocean Spray [Cranberries, Inc. v. PepsiCo, Inc.],* 160 F.3d [58,] at 61 [(1 Cir., 1998)]. We have also noted that 'Massachusetts standards for a preliminary injunction do not seem markedly different' than ours. *Id.* (citing *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 405 N.E.2d 106, 111-12 (1980)).

*Lanier Professional Services, Inc. v. Ricci,* 192 F.3d 1, 3 (1 Cir., 1999); *see also Bio-Imaging Technologies, Inc. v. Marchant*, 584 F. Supp.2d 322, 326 (D. Mass., 2008).

omitted)." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The First Circuit has found the initial element of the test, i.e., likelihood of success on the merits, to be of critical importance. *See Esso Standard*, 445 F.3d at 18 ("'The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.' *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)."); *ANSYS, Inc.*, 595 F.3d at 78 ("The first factor, likelihood of success, is usually given particularly heavy weight.") (citation omitted); *Coquico, Inc.*, 562 F.3d at 66 ("The first of these four factors normally weighs heaviest in the decisional scales.") (citation omitted); *Ross-Simons of Warwick*, 102 F.3d at 16 ("Likelihood of success is the main bearing wall of the four-factor framework." (citations omitted)). However, the First Circuit has also recognized that

> the granting of an injunction is an exercise of equity, and the presence of a weak link in the movant's chain would forestall our reversing the district court's denial under the abuse of discretion standard. Therefore, we concentrate on the district court's finding that a damages remedy would prove adequate to compensate Matrix for any injury. *See Rosario-Urdaz [v. Rivera-Hernandez]*, 350 F.3d [219] at 222 [(1 Cir., 2003)] ('Where a plaintiff stands to suffer a substantial injury that cannot be adequately compensated by an end-of-

29

case award of money damages, irreparable injury
exists.').

*Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.*, 378 F.3d 29, 34 (1
Cir., 2004); *Sampson v. Murray,* 415 U.S. 61, 88 (1974)("We believe that the
Court of Appeals was quite wrong in suggesting that at this [preliminary
injunction] stage of the proceeding the District Court need not have concluded
that there was actually irreparable injury. This Court has stated that '(t)he basis
of injunctive relief in the federal courts has always been irreparable harm and
inadequacy of legal remedies,' *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500,
506-507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959).") (footnote omitted);
*Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 163 (1 Cir.,
2004)("[W]e hold that the district court acted well within the encincture of its
discretion in denying a preliminary injunction on the ground that [movant] had
failed to make the requisite showing of irreparable harm.")(footnote and citation
omitted).

The bottom line is that it is incumbent on the district court to "consider all four

factors." *Air Line Pilots Association, International v. Guilford Transportation

Industries, Inc.*, 399 F.3d 89, 95 (1 Cir., 2005).

## IV. *Discussion*

### A. Choice of Law

The defendants argue that because the Addendum alters the Agreement

for Georgia residents, the law of Georgia must be applied to the restrictive

covenants as a matter of contract interpretation. However, the changes made

by the Addendum are precise and limited. In particular, while the Addendum

deletes the second sentence of section 12 and inserts a new sentence, it leaves

unaltered the first sentence wherein the parties agree that Massachusetts law

shall apply to the Agreement.  Having specifically left the choice of law provision

intact, there is no reason to conclude as a matter of contract interpretation that

because other provisions of the Agreement were changed by the insertion of

state-specific covenants that Georgia law should "trump" the chosen law.

Further, there is no ambiguity raised by the Addendum with respect to the

choice of law provision in the Agreement.

It is undisputed that

> Massachusetts courts give effect to the 'law reasonably
> chosen by the parties to govern their rights under
> contracts'. [*Shipley Co. v. Clark*, 728 F. Supp. 818, 825
> (D. Mass. 1990)] (citation omitted). A choice-of-law
> provision will not be honored, however, if its
> application 'would be contrary to a fundamental policy
> of a state which has a materially greater interest than
> the chosen state in determination of the particular
> issue.' *Id.* (quoting Restatement (Second) of Conflict of
> Laws, § 187(2)(b) (1971)).

*Bio-Imaging Technologies, Inc. v. Marchant,* 584 F. Supp.2d 322, 326-327 (D.
Mass., 2008); *Roll Systems, Inc. v. Shupe*, 1998 WL 1785455, *2 (D. Mass., Jan.
22, 1998).

In the defendants' view, all of the Restatement factors are met in this case such

that the parties' choice of law should be disregarded and Georgia law should be

applied.  The plaintiff disagrees with the defendants' position.

Under Georgia law,

> a restrictive covenant contained in an employment contract is considered to be in partial restraint of trade and will be upheld
>
>> if the restraint imposed is not unreasonable, is founded on a valuable consideration, and is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public.
>>
>> *Rakestraw v. Lanier,* 104 Ga. 188, 194, 30 S.E. 735 (1898).

*W.R. Grace & Co., Dearborn Div. v. Mouyal*, 262 Ga. 464, 465, 422 S.E.2d 529, 531 (Ga., 1992).
The Court examines the reasonableness of the restrictive clause in terms of the nature of the business involved, the circumstances of the parties involved, the length of the restraint, the breadth of the territory covered, the scope of the activity at issue, and similar considerations. *W.R. Grace & Co., Dearborn Div.*, 262 Ga. at 465, 422 S.E.2d at 531.

The law in Massachusetts is basically to the same effect.   While not generally favored, a covenant not to compete is enforceable "provided it is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest." *Novelty Bias Binding Co. v.*

*Shevrin*, 342 Mass. 714, 716, 175 N.E.2d 374, 376 (1961); *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 639, 815 N.E.2d 572, 576-77 (2004), *cert. denied*, 544 U.S. 922 (2005); *Synergistics Technology, Inc. v. Putnam Investments, LLC*, 74 Mass. App. Ct. 686, 690 n. 3, 910 N.E.2d 388, 391 n. 3, *rev. denied*, 455 Mass. 1102 (2009)(Table).   The reasonableness of a restrictive covenant is judged by the attendant facts and circumstances which include whether the business interests to be protected are legitimate, the temporal and geographic limitations imposed, and so forth. *Boulanger*, 442 Mass. at 639, 815 N.E.2d at 577; *Novelty Bias*, 342 Mass. at 716, 175 N.E.2d at 376.       In sum, the law of Massachusetts is "substantially similar" to that of Georgia given that both are founded on considerations of reasonableness when determining whether to enforce a restrictive covenant. *Bio-Imaging Technologies*, 584 F. Supp.2d at 326-27; *Actega Kelstar, Inc. V. Musselwhite*, 2010 WL 744126, *2 (D.N.J., Mar. 2, 2010).   It is true that Georgia does not permit modification of an overbroad covenant not to compete, i.e., blue-penciling, while Massachusetts does.   *Compare*, e.g., *Advance Technology Consultants, Inc. v. RoadTrac, L.L.C.*, 250 Ga. App. 317, 320, 551 S.E.2d 735, 737 (2001) with *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass. App. Ct. 310, 312, 432 N.E.2d 566, 568, *rev. denied*, 386 Mass. 1102

(1982) (Table).   However, as the District Court in New Jersey recently concluded,

> that difference is not meaningful here as the ability to modify an offending NCA [non-compete agreement] does not rise to the level of 'fundamental' policy. *See BABN Techs. Corp. v. Bruno,* No. 98-3409, 1998 WL 720171, at *12 (E.D.Pa. Sept.2, 1998) (adopted magistrate report and recommendation applying Pennsylvania rather than Georgia law to NCA, finding Georgia's policy toward blue penciling is not a fundamental policy).... The difference between the two states' laws is a matter of mere degrees, not a matter of polar difference.

*Actega Kelstar*, 2010 WL 744126, at *3 (footnote omitted).

In short, application of the law of the Commonwealth would not violate a fundamental policy of Georgia.[7]

Next, it cannot be said that Georgia has a materially greater interest in the issue at hand.  Certainly Georgia has an interest in protecting its citizens, i.e., Congrave, from unreasonable restraints.  However, Massachusetts has an equally

---

[7]

   The *Rolls Systems* case is distinguishable.  California was found to have a fundamental policy against the enforcement of restrictive covenants as evidenced by a state statute voiding noncompetition agreements. *Roll Systems*, 1998 WL 1785455, at *2.  Further, "[t]he California courts have held that Section 16600 represents a strong public policy overriding a choice of law provision in a contract at least with regard to possible enforcement of a restrictive covenant." *Roll Systems*, 1998 WL 1785455, at *2 (citations and footnote omitted).  Georgia has no comparable fundamental policy.

strong interest in protecting its citizens. Iron Mountain is headquartered in Boston (#1 ¶ 3) and Congrave has travelled to Massachusetts on business several times a year. (#21 ¶ 5) Massachusetts undoubtedly has an interest in protecting the confidential business information and good will of a company with a principal place of business here. The defendants' contentions notwithstanding, nothing suggests that Georgia enjoys "significantly stronger" (#20 at 12) ties to the parties and the Agreement than Massachusetts.

Having considered the pertinent factors, the Court concludes that Massachusetts law applies in determining the validity, interpretation and performance under the Agreement.

B.  Likelihood of Success

*1. Validity/Enforceability of Agreement*

Iron Mountain is likely to succeed in establishing that, under Massachusetts law, the provisions of the Agreement and Addendum are valid and enforceable. The Agreement is reasonably crafted to protect the plaintiff's legitimate business interests in light of Congrave's position with the company and his extensive knowledge of Iron Mountain's records management services.

So, too, the territorial limitation[8] and temporal scope of the non-disclosure, non-competition and non-solicitation provisions are reasonable. Lastly, it accords with the public interest to enforce the Agreement as a contract between the parties, both of whom benefitted therefrom.

## 2. "Records Management"

Congrave contends that by the term "Records Management" in the Agreement he meant strictly physical records management, but Iron Mountain counters that the term "Records Management" is not so narrow and includes electronic records management, too. First, by the term "Records Management," Congrave was to be describing the "product, service, and/or division/business for which [he was] engaged." (#4-2) Karp has stated that

> Selling electronic records management services was a significant part of Allan Congrave's role as Vice President for the Southeast region. Roughly 15% of Allan's 2009 revenues were attributable to recurring DMS (Document Management Solutions including imaging and scanning services to convert paper records into electronic records) revenues or digital archiving/cloud storage revenues.

---

[8]

Congrave signed a new Agreement each time the scope of his territory changed. (#26 at 10) Consequently, the term "Southeast" in the Addendum means Congrave's territory at the time that he signed the Agreement, that being January 6, 2009. (#4-2)

Supplemental Affidavit of Michael H. Karp #27 ¶ 5; TR Exh. 7 ¶ 5.

Congrave himself admits that approximately 8% of "his monthly sales quota was based on generating sales opportunities for the WorldWide Digital segment." (#21 ¶ 16)  Thus, although selling the plaintiff's digital or electronic services may not have been Congrave's primary job responsibility, it certainly was a significant part of the "business for which [he was] engaged."

In common parlance, "Records Management" is a broad term.  Moreover, in the context of the culture of the company, Karp  states that "[t]he term 'records management' is not generally used at Iron Mountain to mean hard-copy records only." (#27 ¶ 18; TR Exh. 7 ¶ 18)  As a graph illustrating Iron Mountain Solution Categories shows, records management covers both physical and digital records. (#27, Exh. D)   Based on the evidence, Iron Mountain is likely to succeed in proving that the term "Records Management" includes digital or electronic records.

*3. Breach of Non-Competition*

Iron Mountain is likely to succeed in proving that Congrave breached the Agreement in that he is "engaged, within the Territory, in any business that is the same as, substantially similar to, or in competition with" Iron Mountain.

Congrave admits that Viewpointe archives electronic information, supposedly via a different solution or technology, but nonetheless archiving. (#21 ¶ 35) Dodson, Brown and Karp all testified that the position as set forth in the Viewpointe Product Director-ECM job description competes with Iron Mountain. Viewpointe's website reflects the company's "expansion beyond checks into other kinds of archiving services." (TR at 33)  The company offers "[f]ull access to and retention of both active and inactive content" (TR at 95) with tier 1, 2 and 3 storage[9] available (TR at 96), all services Iron Mountain provides. (TR Exh. 11; TR at 150)  Dodson, Brown and Karp all testified that the Viewpointe website page entitled Hosted Digital Content Archive describes services that compete with Iron Mountain. (TR Exh. 11; Tr at 125, 184, 150)  The evidence shows that Viewpointe was trying to sell SunTrust off-site storage of information with Viewpointe not related to the new technology. (TR at 96-98; #29 ¶ 5 ("[Allan] told me [Dodson] that he was discussing with SunTrust a proposal to move certain SunTrust archival data from outdated IBM hardware maintained by SunTrust into storage with Viewpointe."))

However, the plaintiff is not likely to succeed in establishing that the

---

[9] Tier 1 storage is for active information, tier 2 is archive and tier 3 is backup. (TR at 153)

Viewpointe job as described by Congrave to Iron Mountain management was limited to digital archiving of checks and check imaging.  Karp agreed that the first letter from the plaintiff to Congrave dated January 6, 2010 expressed concern that "Iron Mountain offers a wider suite of information that would be of enormous value to Viewpointe" and that "Congrave would take that information and apply it to broader than check processing services." (TR Exh. 1; TR at 159-160)   Karp admitted that in his January 7th conversation with Congrave, he knew that in discussing what Viewpointe does, Congrave "was talking about more than checks." (TR at 162)

In the January 19, 2010 letter from Iron Mountain to Viewpointe, it is stated that the plaintiff understands that Congrave "has accepted a sales position with Viewpointe," but nothing is said about check processing or check imaging. (TR Exh. 2; TR at 164)  Karp agreed that the response letter from Viewpointe makes it clear that the position for which Congrave was hired, "Product Manager to interact with existing Viewpointe clients looking to expand their current suite of Viewpointe services," went beyond check imaging or check processing. (TR Exh. 3; TR at 165)

Similarly, in Congrave's response to the January 6th letter, Karp

39

acknowledges that Congrave does not state that he "is taking a position in the check imaging business of Viewpointe." (TR at 166-167)  Congrave stated that "Viewpointe is not a direct competitor of Iron Mountain.  Iron Mountain does not offer the solution Viewpointe provides." (TR Exh. 4)   The defendant further explained that he was "not taking a sales position; [his] role was a Product Director." (TR Exh. 4)

Karp reviewed and approved of the letter dated January 28, 2010 sent by Roslansky to Congrave. (TR Exh. 5; TR at 169) "[T]he purpose of the letter was to highlight to [] Congrave the inconsistencies between what Viewpointe was saying and what he was saying" and also "to remind [Congrave] of his responsibilities to" Iron Mountain. (TR at 169)   The inconsistencies identified were whether Congrave was to be in sales or a Product Director, whether he was reporting to the CEO or some other person, and whether Congrave sought out the recruiter or the recruiter approached him. (TR Exh. 5; TR at 170)   The January 28th letter does not discuss any inconsistency between the Viewpointe letter wherein it was stated that "Congrave was hired for his general expertise and experience with records management" and what Congrave purportedly was telling Iron Mountain, i.e., that he was only working in check processing and

imaging. (TR Exh. 3; TR Exh. 5; Tr at 170- 171)  Karp testified that he did not "see fit" to put in the January 28th letter that Congrave had told him that "he would only be working in check imaging." (TR at 171)

Iron Mountain claims that it was relying on Congrave's alleged repeated representations that at Viewpointe he would be working only with electronic storage of check and check imaging, yet this limitation, which is of vital significance, is never mentioned in any of the letters.  The absence of the crucial limitation from the contemporaneous writings is glaring, and serves to undercut the veracity of the testimony about Congrave's purported representations. Based on this series of letters and the reasonable inferences to be drawn from them, Iron Mountain is not likely to succeed in proving that it understood that Congrave's position at Viewpointe was limited to check processing and check imaging. Iron Mountain knew that Congrave "was hired for his general expertise and experience with records management," that he was to assume a role "in product management," and that Congrave believed Viewpointe was not "a direct competitor" because it offered a different solution.  Armed with this knowledge, as well as knowledge that Viewpointe was a competitor and the inconsistencies between Viewpointe's explanations and Congrave's explanations, Iron Mountain

wrote to Congrave: "Notwithstanding these points, we are not intending to enforce the non-compete at this point."

Because the plaintiff permitted Congrave to accept the position at Viewpointe, even though Iron Mountain is likely to succeed in proving that Congrave breached the non-competition provision of the Agreement, the equities of the situation do not warrant the issuance of an injunction to enforce the non-competition provision.   As recognized by the First Circuit:

> 'a preliminary injunction - as indicated by the numerous more or less synonymous adjectives used to label it - is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its as-for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.'

*Francisco Sanchez,* 572 F.3d at 15 (*quoting Hamilton Watch Co. V. Benrus Watch Co.,* 206 F.2d 738, 742 (2 Cir., 1953)(Frank, J.)).

While the plaintiff may now have a fuller understanding of Viewpointe and the job Congrave is doing for the company, fundamentally nothing has changed since Iron Mountain wrote the January 28th letter in which it essentially acquiesced in Congrave accepting the position at Viewpointe.  In view of the

Court's finding that Congrave did not materially misrepresent what he would be doing at Viewpointe and absent some, significant intervening event, it would not be equitable to issue a preliminary injunction at this juncture.

"[T]he granting of an injunction is an exercise of equity." *Matrix Group Ltd., Inc.*, 378 F.3d at 34. It is incumbent on the trial court to "balanc[e] the equities," *Waldron v. George Weston Bakeries Inc.*, 570 F.3d 5, 8 (1 Cir., 2009)(*citing Coquico*, 562 F.3d at 66), and base its "decision on 'considerations of equity and fairness.'" *Rivera-Feliciano v. Acevedo-Vila*, 438 F.3d 50, 64 (1 Cir., 2006)(*quoting Catrone v. Mass. State Racing Commission*, 535 F.2d 669, 672 (1 Cir., 1976)). Moreover, "trial courts have wide discretion in making judgments regarding the appropriateness of [injunctive] relief." *Francisco Sanchez*, 572 F.3d at 14 (*citing Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 158 (1 Cir., 2004)). Having carefully weighed all of the facts and circumstances, the Court concludes that it would be unfair and inequitable to enforce the non-competition provision against Congrave and Viewpointe now when Iron Mountain advised Congrave in the January 28th letter that it did not intend to enforce the non-compete clause at that time.

*4. Breach of Non-Solicitation of Employees*

Despite Iron Mountain's suspicions, there is no evidence to show that Congrave had anything to do with the solicitation of Cervenka. The recruiters involved, David and Bobo, uniformly assert that the job description was drafted and sent by them without the review or approval of Viewpointe. (#22 ¶¶ 2, 13; #23 ¶¶ 2, 8) Walsh confirms the recruiters' statements. (#24 ¶¶ 2, 4) Congrave avers that he "had no communications whatsoever with Mr. David or Mr. Bobo regarding Patrick Cervenka, whether by telephone, by e-mail or by in-person conversations." (#30 ¶ 3; #21 ¶ 55) On the current record, the plaintiff has failed to prove that it will likely succeed in proving that Congrave was involved in the solicitation of Cervenka.

*5. Breach of Non-Solicitation of Clients*

Iron Mountain has offered evidence from Dodson that Congrave solicited business from an actual client of the plaintiff, SunTrust. (#29 ¶¶ 3, 5) Although Congrave states in his affidavit that he had "not solicited, and [did] not anticipate that within the next year that [he] would solicit, the business of any entity" (#21 ¶ 52), at the evidentiary hearing, he testified that the owners of Viewpointe, including Sun Trust, had to be convinced to buy the new technology and that "the focus was really just on getting the ownership on board." (TR at

30, 108, 110)  He explained that, with respect to the new technology, "[t]here's a lot of selling that has to be done with the owners," the owners being the banks that owned Viewpointe. (TR at 110)   Congrave also testified that all of Viewpointe's present customers for their check business, not just the owners, would be approached to let them know about the technology. (TR at 111) Financial services is one of Iron Mountain's largest verticals. (TR at 113)

Further, the defendant's description of the services being offered at the meeting with SunTrust was not only the new solution, so called, but a conversion of data and ultimately off-site storage of information with Viewpointe. (TR at 96-98; #29 ¶ 5 ("[Allan] told me [Dodson] that he was discussing with SunTrust a proposal to move certain SunTrust archival data from outdated IBM hardware maintained by SunTrust into storage with Viewpointe.")) Such services would be "the same as, substantially similar to, or competitive with those goods and services provided by Iron Mountain" within the meaning of paragraph 3 of the Addendum.  However, there is a dearth of evidence in the record with respect to whether Congrave had material contact with SunTrust within the meaning of that same paragraph.[10]  Due to this lack of

---

[10]

In his affidavit, Dodson attests:

evidence, Iron Mountain has failed to show a likelihood of success in establishing that Congrave solicited customers and clients in violation of the Agreement.

## C. Irreparable Harm

The First Circuit has explained that "'[i]rreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56, 76 (1 Cir.,2005)(citations omitted); *Ross-Simons of Warwick*, 217 F.3d at 13 ("It is settled beyond peradventure that irreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" (quotation and citation omitted)). Here, the plaintiff has presented uncontroverted evidence[11] that during his tenure at Iron Mountain, Congrave

---

> Allan told me that he had a meeting later that day with an executive at SunTrust who was higher up in the organization than anyone he had succeeded in meeting while employed by Iron Mountain. He told me that he had tried to meet this executive while at Iron Mountain but could never get in to see him.

Affidavit of James Dodson #29 ¶ 3.

These statements do not inform the "material contact" question.

[11]

Congrave minimizes the extent of his knowledge of electronic services, stating in his affidavit that he "did not have any particular expertise in or detailed knowledge of the WorldWide Digital segment." (#21 ¶16) Karp, on the other had, avers that Congrave "and his group were exceptionally knowledgeable about

learned

> substantial amounts of non-public, competitively valuable information, including at least the following five different kinds of information: Pricing Models and Policies...; In-Depth Knowledge of Specific Service Strengths and Weaknesses...; Sales Employee Rankings and Compensation Information...; Operational Know How...; [and] Customer-Specific Information.

Affidavit of Michael H. Karp #5 ¶¶ 6-12; TR Exh. 6 ¶¶ 6-12.

While in the plaintiff's employ, Congrave also "had substantial contact with many Iron Mountain clients" and developed "strong relationships with large Iron Mountain customers." (#5 ¶ 15; TR Exh. 6 ¶ 15)

Congrave now works for an Iron Mountain competitor, Viewpointe. If Congrave were to use his extensive knowledge of Iron Mountain's business or his relationships with Iron Mountain's customers or his knowledge of customer's needs in his new position with Viewpointe, the plaintiff would undoubtedly suffer harm that cannot be quantified in monetary terms.  By its nature, the injury caused would be irreparable.

## D.  Balance of Hardships

---

and successful in selling electronic services," (#27 ¶ 6; TR Exh. 7 ¶ 6), that Congrave "knows Iron Mountain's DMS [Document Management Solutions] business thoroughly," (#27 ¶ 7; TR Exh. 7 ¶ 7), and that Congrave "is also thoroughly familiar with how our DRCI [Digital Records Center for Images] operates." (#27 ¶ 12; TR Exh. 7 ¶ 12)

Congrave testified that as a result obligations arising out of his recent divorce which include child support payments, mortgage payments, etc., he was in a difficult financial situation. (TR at 23-25)  He was largely driven to consider and ultimately accept the position at Viewpointe because he could make more money there than he was making at Iron Mountain. (TR at 23)  Although Iron Mountain attempted to "save" Congrave by offering him an increase in his salary to stay, Congrave declined the offer and, by his own volition, left the plaintiff's employ. (TR at 39, 40, 44, 130, 134; #21 ¶ 29)

Any harm that will inure to Congrave results from enforcing the restrictive covenants set forth in the Agreement that he executed "and that 'fact alone does not make such covenants unenforceable'. *Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 289, 310 N.E.2d 915 (1974)." *Bio-Imaging Technologies*, 584 F. Supp. 2d at 330.  Congrave, as a Vice-President, signed the Agreement with the plaintiff willingly, and reaped the financial benefit of being employed by Iron Mountain for seven years.  Iron Mountain is entitled to rely on the terms of the Agreement to protect its client relationships, its employee relationships and its confidential business information.  Overall, the balance of hardships tips in favor of the plaintiff.  *Bio-Imaging Technologies*, 584 F. Supp.2d at 330.

48

### E. Public Interest

In this case, the public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties. "Enforcement of any covenant not to compete temporarily restricts the free alienability of employees but that alone is insufficient to abrogate a contract or render such covenants unenforceable." *Bio-Imaging Technologies*, 584 F. Supp.2d at 330. No negative impact on the public interest results from holding Congrave to his obligations under the Agreement.

### *V. Conclusion and Order*

Based on the facts and the law as set forth hereinabove, equitable relief in the form of a preliminary injunction for violation of the Agreement's Non-Competition clause is precluded on equitable grounds by Iron Mountain's January 28, 2010 letter to Congrave wherein it is stated:

> Notwithstanding these points, we are not intending to enforce the non-compete at this point. Though we consider Viewpointe a competitor, we prefer to think that you are an individual of integrity who will respect your commitment not to solicit our customers or employees, and that you will respect the sanctity of our proprietary information.

TR Exh. 5.

Having established the necessary elements with respect to Congrave's breach of the Agreement and that Congrave, in fact, is working for a competitor, Iron Mountain is entitled to:

A.      A preliminary injunction enjoining Congrave for a period of one year following the termination of his employment with Iron Mountain, from directly or indirectly, soliciting business from any actual or prospective customer of Iron Mountain with which he had material contact (as "material contact" is defined in Section 3 of the Employee Confidentiality and Non-Competition Agreement dated January 6, 2009) at any time within the 18-month period prior to the termination of his Iron Mountain employment, for purposes of providing such person or entity services that are the same as, substantially similar to, or competitive with services provided by Iron Mountain in connection with records management.

B.      A preliminary injunction enjoining Congrave for a period of one year following the termination of his employment with Iron Mountain, from directly or indirectly, encouraging the

departure, resignation, or other termination of employment
of, or luring, soliciting for employment or seeking to retain on
an independent contractor or consultant basis any individual
who at such time is an employee of Iron Mountain for the
purpose of such individual providing in competition with Iron
Mountain services similar to the services the individual was
providing to Iron Mountain.

C.    A preliminary injunction enjoining Congrave for a period of
three years following the termination of Congrave's
employment with Iron Mountain, to carefully guard and keep
confidential and not disclose or use any confidential,
proprietary or private information (regardless of form)
concerning the business, prospects or affairs of Iron Mountain,
and enjoining Viewpointe not to use or disclose any such
information it has obtained or received from Congrave.

Therefore, it is ORDERED that Plaintiff's Motion for a Preliminary
Injunction (#3) be, and the same hereby is, ALLOWED as indicated, *supra,* and
that said motion be, and the same hereby is, otherwise DENIED.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

April 12, 2010.